1   HELANE L. MORRISON (#127752)
    JAMES A. HOWELL (#92721)
2   MARC J. FAGEL (#154425)
    ANDREW B. HOLMES (#185401)
3
    Attorneys for Plaintiff
4   SECURITIES AND EXCHANGE COMMISSION
    44 Montgomery Street, Suite 1100
5   San Francisco, California  94104
    Telephone:  (415) 705-2500
6

7

8                       UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10                        SAN FRANCISCO DIVISION

11  SECURITIES AND EXCHANGE COMMISSION,   Case No. 01-3376 CRB

12                     Plaintiff,

13            v.
                                          COMPLAINT
14  M & A WEST, INC.; SCOTT L. KELLY;
    SALVATORE CENSOPRANO; ZAHRA R.
15  GILAK; FRANK THOMAS ECK, III; and
    STANLEY R. MEDLEY,
16
                       Defendants.
17

18

19        Plaintiff Securities and Exchange Commission (the "Commission") alleges:

20                        **<u>SUMMARY OF THE ACTION</u>**

21        1.    M & A West, Inc. ("MAWI" or the "Company"), originally of San Bruno,

22  California, purports to be an "Internet incubator" engaged in the development of Internet-

23  related technology companies.  The Company and several affiliated persons participated in a

24  scheme to defraud investors by dumping unregistered shares of MAWI and its related

25  companies into the market, taking large profits and funneling several million dollars of those

26  trading profits back into MAWI, which falsely reported the funds in public reports as revenue

27  from operations that did not in fact exist.

28  //

2.     On four occasions in 1999 and 2000, defendants Scott L. Kelly ("Kelly"), Zahra R. Gilak ("Gilak"), Frank Thomas Eck III ("Eck") and Stanley R. Medley ("Medley") took MAWI's operating divisions (or related companies) public by arranging "reverse mergers" between the privately-owned MAWI entities and publicly traded shell companies.  As a result of these mergers, the MAWI-related entities became publicly traded.

3.     To ensure, among other things, that sufficient public information existed in the market, the federal securities laws required defendants to register the securities prior to reselling the shares to the public.  Defendants failed to register their sales, dumping substantial holdings of unregistered stock into the market after each reverse merger. Defendants' sales of unregistered stock violated the federal securities laws, netting them at least $20 million in unlawful profits.  Following substantial sales of unregistered stock by MAWI, Kelly, Gilak, Eck and Medley, the price of the stocks plummeted, causing substantial losses to investors.

4.     In addition to pocketing the proceeds of their unregistered sales of securities, defendants funneled some of the unlawful trading profits into MAWI.  MAWI, largely through the efforts of Salvatore Censoprano ("Censoprano") and Kelly, fraudulently represented in various press releases and Commission filings that the trading profits from these stock sales constituted revenue from business operations.  These "business operations" were a sham.  For example, MAWI fabricated documents to make it appear that it had earned $1.7 million from the sale of Internet-related subsidiaries, when, in fact, no such sales occurred.

5.     MAWI further created the illusion that it was a highly successful technology company by manipulating the value of the securities holdings that constituted the Company's primary assets.  For example, MAWI fraudulently reported $12.1 million in "unrealized gains on available-for-sale securities" for the fiscal year ended May 31, 2000.  In actuality, that number was substantially and materially overstated because Kelly and Gilak illegally manipulated the stock price of MAWI's largest security holding on the last day of the Company's fiscal year.

6.     As a result of these violations and the fraudulent conduct alleged, the Commission seeks permanent injunctive relief, civil penalties, and other appropriate relief against all defendants, and an accounting and disgorgement of ill-gotten gains against defendants MAWI, Kelly, Gilak, Eck and Medley.

## AUTHORITY TO BRING THIS ACTION

7.     Plaintiff Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act') [15 U.S.C. §§ 77t(b) and 77t(d)], Section 21(d) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and (e)], and Sections 42(d) and (e) of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. §§ 80a-41(d) and (e)].

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d)(1) and 77v(a)], Sections 21(d)(3), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78aa], and Sections 42(e)(1) and 44 of the Investment Company Act [15 U.S.C. §§ 80a-41(e)(1) and 80a-43].  Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, practices and courses of business alleged in this Complaint.

9.     Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 44 of the Investment Company Act [15 U.S.C. § 80-a43].  Certain of the transactions, acts, practices, and courses of business alleged herein occurred within this District.

10.     Assignment to the San Francisco Division is appropriate pursuant to Civil Local Rule 3-2(d) because a substantial part of the alleged misconduct occurred in San Mateo County, California.

## THE DEFENDANTS

11.     MAWI is a Colorado corporation which, until recently, had its principal place of business in San Bruno, California.  The company is now located in Liberty, Texas.

1   MAWI's common stock is registered with the Commission pursuant to Section 12(g) of the

2   Exchange Act, and during the relevant period, was quoted under the symbol "MAWI" on the

3   Over-The-Counter Bulletin Board Service ("OTCBB") operated by The NASDAQ Stock

4   Market, Inc.  MAWI purports to be an "Internet incubator" engaged in the development of

5   Internet-related technology companies.

6        12.    Kelly, 37, until recently of San Bruno, California, was MAWI's President and

7   Chief Executive Officer during the relevant period.  Kelly was also a substantial shareholder,

8   officer, or director of most of the MAWI entities.  Kelly now resides in Chandler, Arizona.

9        13.    Censoprano, 45, is a resident of Foster City, California, and acted as Chief

10  Financial Officer of MAWI during the relevant period.  Censoprano is a licensed Certified

11  Public Accountant in California.

12       14.    Gilak, 47, is a resident of Napa, California, and acted as the Secretary of

13  MAWI during parts of the relevant period.  Gilak and Eck were married during some or all of

14  the period of the violations alleged below.

15       15.    Eck, 53, is a resident of Napa, California, and was married to Gilak during

16  some or all of the period of the violations alleged below.  Eck was MAWI's outside counsel

17  until late 1999, when he resigned from the California bar following his conviction on

18  unrelated federal wire fraud charges.

19       16.    Medley, 51, of Los Angeles, California, was an associate of Eck, and a

20  participant in the reverse mergers at issue in this matter.

21  **I.**    **DEFENDANTS' UNREGISTERED PUBLIC OFFERINGS**

22      **A.**    **Background**

23       17.    MAWI began operations in 1996.  In its annual report on Form 10-KSB for the

24  fiscal year ended May 31, 2000, filed on September 5, 2000 ("2000 Form 10-KSB"), MAWI

25  states:

26          The Company develops, invests in, and operates Internet technology
        related companies.  The strategy of the Company includes the internal
27          development and operation of majority owned subsidiaries within the
        M & A West family, as well as the investment in other Internet

28

1  companies either directly by the Company, or through other venture capital arrangements.

2  This business description has been repeated, essentially verbatim, in dozens of press releases

3  issued by MAWI, as well as on MAWI's Internet home page, during the period relevant to

4  this action.

5      18.    In its 2000 Form 10-KSB, MAWI also states that it "is engaged in providing

6  public relations consulting services primarily to public companies and in the trading of equity

7  securities for its own account in Internet related companies."

8      19.    MAWI became a public company in May 1999 through a reverse merger with a

9  publicly traded shell company, and began quotation on the OTCBB in May 1999.  In the 2000

10  Form 10-KSB, MAWI reported revenue of $7.5 million and net income of $1.9 million.

11  MAWI also reported "unrealized gains on marketable securities" of $12.2 million, for a total

12  of $14.1 million in "comprehensive income."

13      **B.**    **The Reverse Mergers**

14      20.    Between February 1999 and January 2000, Kelly, Eck, Gilak and Medley

15  arranged three separate reverse mergers between MAWI's operating divisions and publicly-

16  traded shell companies.  Each transaction resulted in a substantial majority of the merged

17  company's stock being held by these defendants through nominees they controlled.  These

18  defendants also arranged a fourth reverse merger on behalf of a MAWI client.

19      21.    Following each reverse merger, MAWI commenced "pumping" the stock of the

20  newly constituted company.  Among other things, MAWI followed each merger with a

21  barrage of press releases, paid coverage in Internet investment newsletters, and postings to

22  Internet stock discussion boards.  Defendants thereafter sold large volumes of unregistered

23  securities to the public, netting in excess of $20 million in trading proceeds.

24      22.    These defendants structured each reverse merger to create the illusion that no

25  persons affiliated with the Company were involved in any sale of stock to the public, and thus

26  any such sales would be exempt from registration (and the mandated public disclosures) under

27  the federal securities laws.  To conceal the extensive stock sales by persons affiliated with the

28  //

1 Company, defendants used nominee accounts maintained in the names of defendants' family

2 members or companies controlled by defendants.

3        23.    Kelly, as MAWI's CEO, managed or controlled the private operating

4 companies that became publicly traded companies through the reverse mergers.  Eck, acting

5 as MAWI's outside counsel, negotiated and structured the mergers.  Eck and Gilak, who

6 served as MAWI's corporate secretary, incorporated numerous entities having no operations

7 beyond buying and selling the securities received in connection with each reverse merger, and

8 dispersing the stock (and trading proceeds) to various persons.  Medley located the shell

9 companies into which the MAWI entities merged and negotiated the terms of the transactions

10 between Eck and the shell owners; he received compensation, contingent on the successful

11 completion of the mergers, in both cash and stock for his services.

### 1.    VirtualLender.com, Inc.

13        24.    Defendants' scheme to profit from selling unregistered securities to the public

14 began in or around February 1999.  Kelly, Gilak and Eck arranged a reverse merger between

15 VirtualLender.com, Inc., a private wholly-owned subsidiary of MAWI, and Golden Chain

16 Marketing, Inc. ("Golden Chain"), a publicly traded shell company with no operations.

17 VirtualLender.com was in the business of serving as a residential mortgage and wholesale

18 sub-prime lender via the Internet.  Kelly served as chief executive officer of

19 VirtualLender.com at the time of the merger.  As a result of the reverse merger,

20 VirtualLender.com became a publicly-traded company quoted on the OTCBB under the

21 symbol VLDC.

22        25.    Medley, acting at Eck's behest, identified the public shell company and

23 conducted the negotiations between Eck and the shell owners.  Under a consulting agreement,

24 VirtualLender.com paid $75,000 to entities controlled by Medley for his role in arranging and

25 negotiating the merger.

26        26.    To execute the reverse merger, Golden Chain's officers transferred 7.5 million

27 shares of restricted Golden Chain stock to VirtualLender.com and its assigns and then

28 resigned from the company, giving Kelly control over the combined entity.  In conjunction

1   with the merger transaction, the controlling shareholders of Golden Chain sold an additional

2   1.5 million shares of the Golden Chain stock to nominees controlled by Eck, Gilak, and Kelly.

3   As part of Medley's compensation, Golden Chain's controlling shareholders also sold

4   100,000 shares to an entity controlled by Medley.

5         27.     Trading in VirtualLender.com opened on February 18, 1999 at around $4 and

6   reached an intra-day high of $29 on April 14, 1999.  Between February and August 1999, Eck

7   and Gilak sold more than 460,000 shares of VirtualLender.com through entities they

8   controlled, for a profit of nearly $4 million.  Kelly sold more than 155,700 shares of

9   VirtualLender.com through an account he controlled, for a profit of nearly $2.5 million.

10  Medley effected sales of 48,500 shares through an entity he controlled, for a profit of

11  approximately $215,000.

12        28.     No registration statement was filed with the Commission prior to either the

13  offer or the sale of these shares of VirtualLender.com.

14        29.     Following defendants' stock sales, the price of VirtualLender.com stock

15  declined substantially, and currently trades at pennies a share.

16              **2.      M & A West, Inc.**

17        30.     Defendants' second sale of unregistered securities arose out of the May 1999

18  reverse merger between M & A West itself (then a privately-held company) and Buffalo

19  Capital IV, Ltd. ("Buffalo Capital"), a publicly traded shell company with no operations.

20  Kelly, Eck and Gilak arranged the reverse merger.  The reverse merger resulted in M & A

21  West becoming a publicly-traded company quoted on the OTCBB under the symbol MAWI.

22        31.     Medley, acting at Eck's behest, identified the public shell company and

23  conducted the negotiations between Eck and the shell owners.  Medley received a $75,000

24  consulting fee from M & A West for his role in arranging and negotiating the transaction.

25        32.     To execute the reverse merger, Buffalo Capital IV's officers issued 7.6 million

26  shares of restricted stock to MAWI (and its assigns) and resigned from the company, giving

27  control of the merged entity to MAWI and Kelly.  In conjunction with the merger transaction,

28  the controlling shareholders of Buffalo Capital sold approximately 2 million shares of Buffalo

Capital stock to entities controlled by Eck and Gilak and approximately 900,000 shares to an entity controlled by Kelly.  As part of Medley's compensation, Buffalo Capital's controlling shareholders also sold 110,000 shares of Buffalo Capital to an entity controlled by him.

33.    Trading in MAWI opened on May 13, 1999 at around $6, reaching an intra-day high of $27.75 on December 29, 1999.  Between May 1999 and November 2000, Eck and Gilak sold approximately 860,000 MAWI shares through entities and accounts they controlled, grossing in excess of $8.5 million in trading proceeds.  In addition, Medley sold more than 84,500 MAWI shares through entities and accounts he controlled, generating proceeds of over $530,000.   Nearly all of the public float for MAWI stock was created by sales by Eck, Gilak and Medley.  No registration statement was filed with the Commission prior to either the offer or the sale of these shares of MAWI.

34.    No registration statement was filed with the Commission prior to either the offer or the sale of these shares of MAWI.

35.    Following these massive sales by insiders, MAWI's stock price dropped to under $5, and recently has traded in the pennies.

### 3.    Workfire.com, Inc.

36.    Defendants' third sale of unregistered securities arose out of the June 1999 reverse merger between Workfire.com, an Internet-related software firm that retained MAWI to assist it in going public, and Buffalo Capital VII, Ltd. ("Buffalo Capital"), a publicly traded shell company with no operations.  Kelly, Eck and Gilak arranged the reverse merger.  The reverse merger resulted in Workfire.com becoming a publicly-traded company quoted on the OTCBB under the symbol WKFR.

37.    Medley, acting at Eck's behest, identified the public shell company and conducted the negotiations between Eck and the shell owners.  Medley received a $75,000 "consulting fee" from a nominee account controlled by Gilak and Kelly for his role in arranging and negotiating the transaction.

38.    To execute the reverse merger, Buffalo Capital VII's officers transferred 12.7 million shares of restricted stock to Workfire.com and resigned from the company, which

1   gave control of the merged entity to Workfire.com.  In conjunction with the merger

2   transaction, the Buffalo Capital VII shareholders sold approximately 862,500 shares of stock

3   to MAWI.   As part of Medley's compensation, Buffalo Capital VII's controlling shareholders

4   sold approximately 150,000 shares of Buffalo Capital VII stock to an entity controlled by

5   him.

6       39.     Trading in Workfire.com opened on June 21, 1999 at about $4.50, trading as

7   high as $6.50 (an intra-day high) over the next two weeks.  Between June and October 1999,

8   MAWI sold approximately 286,600 shares, generating proceeds in excess of $575,000.

9       40.     No registration statement was filed with the Commission prior to either the

10  offer or the sale of these shares of Workfire.com.

11      41.     Following MAWI's sales of Workfire.com stock, the price declined

12  substantially.

13              **4.     Digital Bridge, Inc.**

14      42.     Defendants' fourth and final sale of unregistered securities arose out of the

15  February 2000 reverse merger between Digital Bridge, a wholly owned subsidiary of MAWI

16  in the web design business, and Black Stallion Management, Inc. ("Black Stallion"), a

17  publicly-traded shell company with no operations.  Kelly and Gilak arranged the reverse

18  merger.  The reverse merger resulted in Digital Bridge becoming a publicly-traded company

19  quoted on the OTCBB under the symbol DBGI (subsequently changed to DGBI).

20      43.     Medley identified the public shell company and conducted the merger

21  negotiations.   Two companies controlled by Medley received a $50,000 consulting fee on his

22  behalf from nominee accounts controlled by Gilak and Kelly for his role in arranging and

23  negotiating the transaction.

24      44.     To execute the reverse merger, Black Stallion's controlling shareholders

25  transferred 20 million shares of restricted Black Stallion stock to MAWI and to two officers

26  of Digital Bridge.  Black Stallion's officers then resigned from the company, giving control of

27  the merged entity to MAWI and Digital Bridge.  In conjunction with the merger transaction,

28  Black Stallion's controlling shareholder sold 2 million shares of Black Stallion stock to two

COMPLAINT                                    -9-
Case No. 01-3376 CRB

1  corporate entities controlled by Gilak, Eck and Kelly.  As part of Medley's compensation,

2  Black Stallion's controlling shareholder also sold 400,000 shares to entities controlled by

3  Medley.

4      45.    Trading in Digital Bridge opened on February 11, 2000 at $3, reaching an intra-

5  day high of $12.25 on February 22, 2000.  In the first week of trading in Digital Bridge stock,

6  Gilak, Eck and Kelly, acting through nominees, sold approximately 615,000 shares for trading

7  proceeds in excess of $2.7 million.  They sold an additional 77,800 shares for $177,000 in the

8  months that followed.  Medley sold more than 370,000 shares, for trading proceeds of over

9  $1.08 million.

10      46.    No registration statement was filed with the Commission prior to either the

11  offer or the sale of these shares of Digital Bridge.

12      47.    Following defendants' sales of Digital Bridge stock, the price declined

13  substantially.

14  **II.**    **DEFENDANTS' FINANCIAL FRAUD**

15      48.    A central feature of defendants' fraudulent scheme was the funneling of the

16  proceeds of the unregistered stock sales back into MAWI in order to create the illusion that

17  MAWI was a successful "Internet incubator."  Kelly and Censoprano disguised the actual

18  source of these cash infusions in MAWI's Commission filings and public statements, and

19  fabricated documents provided to MAWI's auditors, so that the cash appeared to be the result

20  of MAWI's operations and legitimate financing activities.

21      **A.**    **MAWI's Fraudulent 1999 Form 8-K/A and Form 10-KSB**

22      49.    Shortly after the VirtualLender.com reverse merger, Kelly caused a nominee

23  account he controlled to transfer $2 million in proceeds from the sale of VirtualLender.com

24  stock to MAWI.  This sum represented essentially the entire cash balance of the Company at

25  the time.  In its Form 8-K/A filed with the Commission on August 18, 1999 ("1999 Form 8-

26  K/A") and its Form 10-KSB for the fiscal year ended May 31, 1999 filed with the Commission

27  on September 13, 1999 ("1999 Form 10-KSB"), MAWI described the $2 million as "issuance

28  of stock for cash" included in the category "net cash provided by financing activities."

1   50.     The filings falsely represented that the funds originated from legitimate

2   financing activities, when, in fact, they were the proceeds of sales of unregistered

3   VirtualLender.com stock by MAWI's CEO.

4   51.     In order to conceal the actual source of the $2 million from MAWI's auditors

5   and the public, Eck, with the knowledge of Kelly and Censoprano, prepared and provided to

6   the auditors falsified subscription agreements (signed by Eck and Gilak) purporting to show

7   an investment in MAWI by three corporate entities (all of which were nominee accounts

8   established by Eck and Gilak).  The documents purported to show that these three

9   corporations had paid a total of $2 million for MAWI stock when in fact they never paid for

10  nor received stock pursuant to the falsified subscription agreements.

11  52.     The 1999 Form 8-K/A and the 1999 Form 10-KSB also misrepresented

12  defendants' control over the vast majority of the outstanding shares of MAWI stock.  The

13  filings falsely stated that 27% of MAWI's stock was held by investors unaffiliated with

14  MAWI.  In fact, these "investors" were nominee accounts controlled by Eck and Gilak.  As a

15  result, the 1999 Form 8-K/A and 1999 Form 10-KSB misleadingly concealed from investors

16  the fact that essentially every share of MAWI stock bought was being purchased from a

17  MAWI insider.

18  53.     Kelly signed both the 1999 Form 8-K/A and the 1999 Form 10-KSB.  He and

19  Censoprano also signed a management letter to MAWI's auditors misrepresenting the terms

20  of the bogus $2 million financing arrangement.

21  **B.     MAWI's Fraudulent Financial Statements For Fiscal Year 2000**

22  54.     On August 17, 2000, MAWI issued a press release announcing a 1,167%

23  increase in revenue over the prior year.  In MAWI's 2000 Form 10-KSB for the fiscal year

24  ended May 31, 2000, MAWI reported revenue of $7.38 million, compared to $602 thousand

25  for fiscal 1999 – a 1,167% increase.  MAWI further reported, as separate line items, revenue

26  of $1.7 million from the sale of subsidiaries and $12.1 million in unrealized gains on its

27  holdings of VirtualLender.com and Digital Bridge stock.  Based on these numbers, MAWI

28  //

1  reported a "comprehensive income" of $14.1 million.  Each of these components of MAWI's

2  financial results was fraudulent and materially overstated.

3  ## 1. False Sales and Consulting Revenues

4  ### (a)  Non-existent sales of subsidiaries

5  55.  For fiscal 2000, MAWI reported $1.7 million in revenue from the sales of

6  Internet-related businesses developed by MAWI.  The revenue from these sham sales

7  accounted for 14% of MAWI's comprehensive income.  Contrary to the report, the sales were

8  complete fabrications, devised to disguise certain defendants' sales of unregistered stock as

9  legitimate MAWI operations.

10  56.  Of the $1.7 million, MAWI publicly reported that $1.2 million derived from

11  MAWI's sale of an Internet-based gambling website it had developed, VirtualWagering.com,

12  to an unnamed "European concern."  In the same report, MAWI also claimed to have entered

13  into a two-year consulting agreement relating to the website that would generate an additional

14  $1 million in revenue, of which $125,000 was recognized in fiscal 2000.

15  57.  The claimed sale of VirtualWagering.com was a complete sham.  Kelly and

16  Gilak arranged to wire $2.2 million in proceeds from the illegal sale of unregistered Digital

17  Bridge stock to MAWI.  Kelly, Eck, Gilak and Censoprano then planned and engaged in a

18  scheme to make it appear that the money had been raised from the sale of

19  VirtualWagering.com.  Censoprano created phony sales agreements to make it appear that the

20  site was sold for $1.2 million (plus $1 million in consulting fees).  In fact, the $2.2 million

21  had no relationship to any purported sale of VirtualWagering.com.

22  58.  The bogus VirtualWagering.com sale was first announced by MAWI in a

23  February 2000 press release, and the revenue was first reported in MAWI's Form 10-QSB for

24  the quarter ended February 29, 2000.

25  59.  The remaining $500,000 included in the $1.7 million of purported subsidiary

26  sales derived from the supposed sale of Internet websites related to the marketing of the

27  "Pokemon" cartoon character.  The claimed sale of these Pokemon sites was a complete

28  //

1    sham.  Censoprano created documents purporting to show a sale of the websites, when in fact

2    no such sale had occurred.

3                    **(b)      Fabricated and inflated consulting fees**

4        60.     In its 2000 Form 10-KSB, MAWI reported $7.38 million in consulting revenue

5    for the fiscal year ended May 31, 2000.  This number was materially overstated.

6        61.     One million dollars of the claimed consulting revenue (approximately 14% of

7    the total consulting revenue reported by the Company) represented the proceeds of

8    unregistered stock sales funneled into MAWI from the nominee accounts controlled by Eck,

9    Gilak and Kelly.  Censoprano, with Kelly's knowledge, prepared phony consulting

10   agreements purporting to show that MAWI had been compensated for consulting services

11   which, in fact, were never provided.  Of the $1 million in phony consulting revenue, $125,000

12   related to the bogus sale of VirtualWagering.com referenced above.  The remainder related to

13   phony consulting agreements between MAWI and various corporate entities controlled by

14   Eck, Gilak and Kelly.

15       62.     An additional $4.3 million in reported consulting revenue (57% of the total

16   consulting revenue) related to MAWI's compensation for services provided to Workfire.com

17   in connection with arranging the Workfire.com reverse merger.  MAWI calculated this

18   consulting fee by multiplying the 750,000 shares of Workfire.com stock it had received in the

19   Workfire.com merger by $5.75, the trading price of the stock on the day the shares were

20   received.

21       63.     This component of MAWI's consulting revenue was substantially and

22   materially inflated.  Under generally accepted accounting principles ("GAAP"), stock

23   received in exchange for services must be measured at its fair value.  Here, because MAWI

24   received the stock from an affiliate of the issuer as part of an unregistered distribution, the

25   stock could not have been freely traded, substantially reducing its value.  Moreover, MAWI's

26   holdings in Workfire.com, Inc. were illiquid -- average daily trading volume after the reverse

27   merger was approximately 11,000 shares, while MAWI owned 750,000 shares -- and thus

28   //

1   there was no reasonable basis for MAWI to conclude that it could have liquidated its

2   Workfire.com holdings at the quoted price.

3       64.    MAWI similarly misrepresented the Workfire.com stock at an inflated and

4   unsupportable value in its Forms 10-QSB for the quarters ended August 31 and November 30,

5   1999.

6                     **2.   Manipulated value of stock holdings**

7       65.    In its 2000 Form 10-KSB, MAWI reported $12.1 million in "unrealized gains

8   on available-for-sale securities" based on its VirtualLender.com and Digital Bridge stock

9   holdings.  MAWI calculated these gains using the closing price of the stocks on May 31, the

10  last day of the fiscal year.  As described below, defendants fraudulently manipulated the price

11  of VirtualLender.com stock on that day, resulting in the overstatement of MAWI's

12  "comprehensive income" by approximately $5 million (or 56%).

13      66.    Kelly, with the assistance of Gilak, manipulated the trading price of

14  VirtualLender.com stock in order to fraudulently inflate the purported value of the stock in

15  MAWI's financial statements.  As the end of the fiscal year approached, trading in

16  VirtualLender.com (renamed VLDC Technologies) had fallen off substantially, with minimal

17  trading on a daily basis, and the price had declined to under a dollar (from a high of $29

18  following the reverse merger).  In order to drive up the stock price (and, with it, MAWI's

19  supposed financial performance), Kelly and Gilak arranged for various nominee accounts

20  controlled by Gilak to make sizeable purchases of VirtualLender.com stock on May 31.  This

21  buying activity accounted for nearly all of the retail trading volume on May 31 and caused a

22  12-fold increase in volume.  As a result, VirtualLender.com's price nearly tripled, from $0.88

23  to $2.50.  The following day, the price of VirtualLender.com returned to its pre-manipulation

24  trading price and volume, and has not risen above $1 since.

25      67.    Censoprano improperly used the inflated May 31 closing price, which he knew

26  or was reckless in not knowing did not represent the fair value of the VirtualLender.com

27  stock, as the basis for valuing the stock in MAWI's financial statements included in the 2000

28  Form 10-KSB.

COMPLAINT                    -14-
Case No. 01-3376 CRB

68.     MAWI's 2000 Form 10-KSB also reported total assets of approximately $30 million, based on the same materially overstated valuation of the VirtualLender.com stock.  A press release, dated August 17, 2000, cited the tainted valuation as evidence that the Company had experienced "phenomenal growth [that] exceeded even our expectations."

## FIRST CLAIM FOR RELIEF
### Violations of Section 5(a) and 5(c) of the Securities Act
(Against Defendants MAWI, Kelly, Gilak, Eck and Medley)

69.     Paragraphs 1 through 68 are incorporated by this reference.

70.     From approximately February 1999 to March 2000, MAWI, Kelly, Gilak, Eck and Medley, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell securities through the use or medium of a prospectus or otherwise when no registration statement had been filed or was in effect as to such securities and no exemption from registration was available.

71.     While engaged in or participating in the unlawful distribution of VirtualLender.com, MAWI, Workfire, and Digital Bridge stock, defendants MAWI, Kelly, Gilak, Eck and Medley were underwriters, as defined in section 2(11) of the Securities Act.

72.     By reason of the foregoing, MAWI, Kelly, Gilak, Eck and Medley, directly or indirectly, violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
(Against Defendants MAWI, Kelly, Censoprano, Gilak and Eck)

73.     Paragraphs 1 through 68 are incorporated by this reference.

74.     Defendants MAWI, Kelly and Censoprano, by engaging in the conduct set forth in Paragraphs 1 through 63 above, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter:  (1) employed devices, schemes or artifices to defraud; (2) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaged in acts, practices or courses of

//

1    business which operated or would operate as a fraud or deceit upon other persons, in

2    connection with the purchase or sale of securities.

3         75.     Gilak and Eck willfully aided and abetted the violations by MAWI, Kelly and

4    Censoprano of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, by knowingly

5    providing substantial assistance to them in carrying out the violation.

6         76.     By reason of the foregoing, MAWI, Kelly, Censoprano, Gilak and Eck, directly

7    or indirectly, violated, and unless enjoined will continue to violate, Section 10(b) of the

8    Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R.

9    §§ 240.10b-5].

10
11
12

### THIRD CLAIM FOR RELIEF
#### Violation of Section 13(a) of the Exchange Act and
#### Rules 12b-20, 13a-1, 13a-11 and 13a-13
(Against Defendants MAWI, Kelly, Censoprano, Gilak and Eck)

13         77.     Paragraphs 1 through 68 are incorporated by this reference.

14         78.     MAWI filed with the Commission annual reports on Form 10-KSB for the

15    years ended May 31, 1999 and May 31, 2000 that contained untrue statements of material fact

16    and omitted to state material information required to be stated therein or necessary in order to

17    make the required statements made, in the light of the circumstances under which they were

18    made, not misleading, in violation of Section 13(a) of the Exchange Act and Rules 12b-20 and

19    13a-1 thereunder.

20         79.     MAWI filed with the Commission quarterly reports on Form 10-QSB for the

21    quarters ended August 31, 1999, November 30, 1999 and February 9, 2000 that contained

22    untrue statements of material fact and omitted to state material information required to be

23    stated therein or necessary in order to make the required statements made, in the light of the

24    circumstances under which they were made, not misleading, in violation of Section 13(a) of

25    the Exchange Act and Rules 12b-20 and 13a-13 thereunder.

26         80.     MAWI filed with the Commission a current report on Form 8-K for the period

27    ended May 31, 1999, that contained untrue statements of material fact and omitted to state

28    material information required to be stated therein or necessary in order to make the required

1  statements made, in the light of the circumstances under which they were made, not

2  misleading, in violation of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11

3  thereunder.

4        81.    Kelly, Censoprano, Gilak and Eck willfully aided and abetted the violations by

5  MAWI of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13

6  thereunder by knowingly providing substantial assistance to MAWI in carrying out the

7  violation.   Therefore, Kelly, Censoprano, Gilak and Eck are deemed to be in violation of

8  Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder to

9  the same extent as the person to whom their assistance was provided.

10       82.    By reason of the foregoing, MAWI, Kelly, Censoprano, Gilak and Eck violated,

11 and unless enjoined will continue to violate, Section 13(a) of the Exchange Act and Rules

12 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [15 U.S.C. 78m(a) and 17 C.F.R. §§ 242.12b-

13 20, 242.13a-1, 242.13a-11 and 242.13a-13].

14

15                          **FOURTH CLAIM FOR RELIEF**
                      **Violation of Section 13(b)(2)(A) of the Exchange Act**
16                 (Against Defendants MAWI, Kelly, Censoprano, Gilak and Eck)

17       83.    Paragraphs 1 through 68 are incorporated by this reference.

18       84.    MAWI failed to make and keep books, records, and accounts which, in

19 reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets

20 of the Company, in violation of Section 13(b)(2)(A) of the Exchange Act.

21       85.    Kelly, Censoprano, Gilak and Eck willfully aided and abetted the violations by

22 MAWI of Sections 13(b)(2)(A) of the Exchange Act by knowingly providing substantial

23 assistance to MAWI in carrying out the violation.

24       86.    MAWI violated, and unless enjoined will continue to violate, Section

25 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

26       87.    Kelly, Censoprano, Gilak and Eck aided and abetted, and unless enjoined will

27 continue to aid and abet violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C.

28 § 78m(b)(2)(A)].

### FIFTH CLAIM FOR RELIEF
**Violation of Section 13(b)(2)(B) of the Exchange Act**
(Against Defendants MAWI, Kelly, Censoprano, Gilak and Eck)

88.    Paragraphs 1 through 68 are incorporated by this reference.

89.    MAWI failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable reassurances that:  (a) transactions are executed in accordance with management's general or specific authorization; (b) transactions are recorded as necessary (i) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (ii) to maintain accountability for assets; (c) access to assets is permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences, in violation of Section 13(b)(2)(B) of the Exchange Act.

90.    Kelly, Censoprano, Gilak and Eck knowingly provided substantial assistance to MAWI's violation of Section 13(b)(2)(B) of the Exchange Act.

91.    MAWI, Kelly, Censoprano, Gilak and Eck violated, and unless enjoined will continue to violate, Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

### SIXTH CLAIM FOR RELIEF
**Violations of Section 13(b)(5) of the Exchange Act**
(Against Defendants Kelly, Censoprano, Eck, and Gilak)

92.    Paragraphs 1 through 68 are incorporated by this reference.

93.    By engaging in the conduct described above, Defendants Kelly, Censoprano, Gilak, and Eck knowingly circumvented or knowingly failed to implement MAWI's system of internal accounting controls or knowingly falsified MAWI's books, records and accounts in violation of Section 13(b)(5) of the Exchange Act.

94.    Kelly, Censoprano, Gilak, and Eck have violated, and unless enjoined, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. 78m(b)(5)].

//

//

**SEVENTH CLAIM FOR RELIEF**
**Violations of Rule 13b2-1 of the Exchange Act**
(Against Defendants Kelly, Censoprano, Gilak, and Eck)

95.     Paragraphs 1 through 68 are incorporated by this reference.

96.     By engaging in the conduct described above, Defendants Kelly, Censoprano, Gilak, and Eck falsified or caused to be falsified MAWI's books, records and accounts in violation of Rule 13b2-1 under the Exchange Act.

97.     Kelly, Censoprano, Gilak, and Eck have violated, and unless enjoined, will continue to violate Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1].

**EIGHTH CLAIM FOR RELIEF**
**Violations of Rule 13b2-2 of the Exchange Act**
(Against Defendants Kelly, Censoprano and Eck)

98.     Paragraphs 1 through 68 are incorporated by this reference.

99.     By engaging in the conduct described above, and in connection with an audit or examination of MAWI's financial statements and the preparation and filing of statements and reports with the Commission, Defendants Kelly and Censoprano made or caused to be made a materially false or misleading statement to accountants and omitted to state, or caused another person to omit to state to accountants material facts necessary in order to make statements made to the accountants, in light of the circumstances under which such statements were made, not misleading, in violation of Rule 13b2-2 under the Exchange Act.

100.     Eck knowingly provided substantial assistance to Kelly's and Censoprano's violation of Rule 13b2-2 under the Exchange Act.

101.     Defendants Kelly, Censoprano and Eck violated, and unless enjoined, will continue to violate Rule 13b2-2 under the Exchange Act [17 C.F.R. § 240.13b2-2].

**NINTH CLAIM FOR RELIEF**
**Violation of Section 7(a) of the Investment Company Act**
(Against Defendant MAWI)

102.     Paragraphs 1 through 68 are incorporated by this reference.

103.     MAWI, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or the mails, offered for sale, sold, or

delivered after sale, a security or an interest in a security while operating as or holding itself out to be an investment company, as to which no registration statement was filed with the Commission or was in effect, and no exemption from registration was available, in violation of Section 7(a) of the Investment Company Act.

104.     MAWI has violated, and unless enjoined, will continue to violate, Section 7(a) of the Investment Company Act [15 U.S.C. § 80a-7(a)].

## TENTH CLAIM FOR RELIEF
### Violations of Section 15(a) of the Exchange Act
(Against Defendant Medley)

105.     Paragraphs 1 through 68 are incorporated by this reference.

106.     Defendant Medley, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or the mails, acted as a broker and/or effected transactions in, and induced or attempted to induce the purchase or sale of, securities (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) without being registered with the Commission in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

107.     By reason of the foregoing, Medley, directly or indirectly, violated, and unless enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

a.     Enjoin each of the defendants from future conduct that violates the provisions of the federal securities laws alleged in this complaint.

b.     Order defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 42(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)].

c.     Order defendants MAWI, Kelly, Gilak, Eck and Medley to account for and disgorge an amount equal to their unjust enrichment as a result of their conduct alleged herein, plus prejudgment interest thereon;

1    d.      Impose an officer and director bar on defendants Kelly, Censoprano and Gilak

2    pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

3    e.      Retain jurisdiction of this action in accordance with the principles of equity

4    and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all

5    orders and decrees that may be entered, or to entertain any suitable application or motion for

6    additional relief within the jurisdiction of this Court; and

7    f.      Grant such other and further relief as this Court may deem appropriate.

8

9    DATED: September 6, 2001                    Respectfully submitted,

10

11                                        _____

12                                        HELANE L. MORRISON
                                          JAMES A. HOWELL
13                                        MARC J. FAGEL
                                          ANDREW B. HOLMES

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28