**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8          **IN THE UNITED STATES DISTRICT COURT**
9        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10
11 **SECURITIES & EXCHANGE COMMISSION,**     **No   C-01-3376 VRW**
12       **Plaintiff,**           **ORDER**
13       **v**
14 **M & A WEST, INC et al,**
15       **Defendants.**
16 _____/
17
18       **Plaintiff Securities & Exchange Commission (the**
19 **"Commission") moves for summary judgment against defendant Stanley**
20 **Medley ("Medley") on its claims against him for:**
21       **(1) offering and selling securities when no registration**
22 **statement had been filed and no exemption from registration was**
23 **available, in violation of sections 5(a) and (c) of the Securities**
24 **Act of 1933 (the "Securities Act"), 15 USC §§ 77e(a) and (c); and**
25       **(2) acting as a broker without being registered with the**
26 **Commission in accordance with section 15(b) of the Securities**
27 **Exchange Act of 1934 (the "Exchange Act"), in violation of section**
28 **15(a) of the Exchange Act, 15 USC § 78o(a). Doc #109.**

United States District Court

For the Northern District of California

For the reasons that follow, the court **GRANTS IN PART** the Commission's motion relative to claim (1) and sua sponte **GRANTS** summary judgment in favor of Medley on the Commission's claim (2).

I

A brief background on the applicable securities law will lay the foundation for the somewhat intricate facts of this case. Section 5 of the Securities Act prohibits the unregistered sale of securities. Registration is required on a transaction-by-transaction basis; securities themselves are not "registered" once and for all. Registration is an often expensive and time-consuming process of making certain reports to and obtaining authorization from the Commission to sell a security. As such, section 4 of the Securities Act provides exemptions from the registration requirement under circumstances where registration -- which is intended to provide full disclosure to the investing public -- would serve little purpose. The most obvious example of such a circumstance is a securities transaction between two members of the investing public who are unaffiliated with the issuer of the securities. Such investors possess no special knowledge about the issuer and are thus on equal footing in making their trade.

Such trades are exempted from the section 5 registration requirement by section 4(1), which exempts "transactions by any person other than an issuer, underwriter, or dealer" -- the belief being, presumably, that issuers, underwriters and dealers (but no one else) have information superior to that possessed by the public at large. This case is about whether Medley was an "underwriter"; that term has a particular statutory definition under section 2(11)

United States District Court

For the Northern District of California

of the Securities Act.  An underwriter is someone who has purchased securities from an issuer (or an affiliate of an issuer) with a view to the (public) distribution of those securities.  As the court will discuss in greater detail below, Medley's status as an underwriter turns on whether he took shares from an affiliate (a person or group of persons controlling or controlled by an issuer), or escaped the statute by clever sequencing of his transactions.

As for the Commission's unregistered broker claim, the operative statutory language is the definition of "broker" in section 3(a)(4)(A) of the Exchange Act:  "any person engaged in the business of effecting transactions in securities for the account of others."  Although this language is somewhat opaque, the court has not been supplied with further interpretive guidance.

II

This case arises out of the activities of M & A West, Inc ("M & A West") and its affiliates; M & A West can fairly be described as a sham incubator for startup companies.  Although other defendants (M & A West, Scott Kelly, Salvatore Censoprano, Zahra Gilak and Frank Thomas Eck, III) are charged in the complaint (Doc #3) with stock manipulation and accounting fraud, the claims against Medley are limited to selling securities when no registration statement had been filed and acting as an unregistered broker.  Moreover, the claims against Medley arise only from his facilitation of and participation in so-called reverse merger transactions, while the claims against other defendants arise not only from these reverse mergers but also from M & A West's operations and those other defendants' allegedly fraudulent

3

United States District Court

For the Northern District of California

transactions in the securities of M & A West and related companies.

As this is a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion -- here, Medley.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v Liberty Lobby, 477 US 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id.

That said, the court works here from a record without genuine disputes of material fact, as suggested by the absence in Medley's papers of any detailed discussion of the merger transactions at issue.  See Medley Opp (Doc #120) at 2-7; Medley Decl (Doc #121).  Indeed, at oral argument, Medley's counsel volunteered that she did not contend there were issues of material fact with respect to the structure of the transactions at issue.  To be sure, Medley discusses at great length his contentions about his role in the transactions and the disposition of his proceeds from the transactions.  These contentions may be relevant to the scope of relief to which the Commission is entitled (a question for another day), but as will become apparent, Medley's factual contentions are immaterial to the instant motion, which is only directed to Medley's liability.  Accordingly, what follows are the undisputed facts about the reverse mergers that Medley facilitated.

A "reverse merger," as used herein and in the parties' papers, is a transaction in which a private operating corporation

(a "private" company) merges into a corporation whose stock has previously been offered to the public (a "public" company). Typically, the public company will at the time of the reverse merger be a "shell" company with minimal assets and liabilities and no actual operations.  To complete the securities aspect of the reverse merger, the public shell company will exchange its treasury stock (along with, perhaps, shares from its stockholders) for all outstanding shares of the private company, and in consideration, the shareholders who control the public shell company will transfer most of their shares in the shell company to the owners of the private company.  Often the public shell company will take on the name formerly used by the private company, and operations will carry on as before, except the formerly private company is now an issuer of publicly traded securities.  The overall transaction thus provides a way for the private company effectively to offer its stock to the public.

Medley would work with the shareholders of private companies to execute such reverse mergers by identifying suitable public shell companies and by, at a minimum, preparing the documents for the reverse mergers and coordinating among the various parties to the reverse mergers.  See, e g, Medley Testimony (Ex 2[1]) [hereinafter "Test"] at 50; Medley Deposition (Ex 1) [hereinafter "Depo"] at 24, 31-32.

Because the reverse mergers -- four are at issue -- are central to the claims against Medley, the court will discuss them

---

[1]"Ex" citations refer to the exhibits to the Declaration of Elena Ro (Doc #110).

United States District Court

For the Northern District of California

in some detail.

(1)  The first of the four reverse mergers was between VirtualLender.com, Inc ("Virtual Lender") and Golden Chain Marketing, Inc ("Golden Chain").  Virtual Lender was a subsidiary of M & A West engaged in the business of selling mortgages over the Internet; Golden Chain was a public shell company with no business operations.  Medley "work[ed] on" this reverse merger by, at a minimum, "communicating" between Virtual Lender's owners and Golden Chain's owners.  Test at 49-51.  The reverse merger was contracted for in a "reorganization and stock purchase agreement," Ex 5, in which Medley's nominee (Robert Bryan) was to receive 100,000 shares of Golden Chain stock, id §1.  Ultimately, it was Fordee Management Company ("Fordee"), which Medley owned, that received the shares. See Ex 7 (Fordee account statements).  The Virtual Lender reverse merger agreement was made by Golden Chain by shareholders owning not less than approximately 75% of Golden Chain's outstanding stock.  Ex 5 § 1.

(2)  The next reverse merger was between M & A West and Buffalo Capital IV, Ltd ("Buffalo IV").  Again, Medley was involved, at a minimum, in facilitating the transaction.  See Exs 11, 12 (correspondence from Medley related to drafting of stock purchase agreements).  Unlike the Virtual Lender transaction, the M & A West transaction was to proceed in two steps on successive days:  First, Buffalo IV would issue new shares and transfer those shares (along with some of its stockholders' shares) to M & A West in exchange for all of M & A West's outstanding shares, upon which Buffalo IV's officers (also its stockholders) would resign.  The issuance of the new shares would also dilute the existing Buffalo

6

United States District Court

For the Northern District of California

IV shareholders' holdings considerably, and the exchange of all of M & A West's shares would cause M & A West to become a subsidiary of Buffalo IV.  On the next day, Buffalo IV's shareholders would deliver most of their shares to the former shareholders of M & A West for fairly nominal cash consideration, also delivering 110,000 shares to Medley's nominee (again, Robert Bryan).  See Ex 10 (various agreements executed to this end).  As with the Virtual Lender transaction, it was Fordee that actually received the shares.  Exs 13, 14 (directions from Medley that shares be transferred to Fordee); Ex 7 (Fordee account statements).  The agreement embodying the first stage of the M & A West transaction was made by Buffalo IV shareholders owning not less than approximately 75% of Buffalo IV's outstanding stock.  Ex 10 § 1. These same shareholders separately executed stock purchase agreements embodying the second stage of the transaction.  Ex 10.

(3)  The next reverse merger also appears to have employed a two-step structure like the M & A West transaction. Medley was involved in the reverse merger of Workfire.com ("Workfire") into Buffalo Capital VII, Ltd ("Buffalo VII").  See Exs 16, 17 (correspondence from Medley related to Workfire).  The agreement embodying the first stage of the Workfire transaction is similar to the shareholder agreement embodying the first stage of the M & A West transaction.  Ex 19.  The Commission has supplemented the record to provide the court the complementary stock purchase agreement for the second stage.  LaMarca (Doc #131) Ex 19B.  Moreover, the shareholder agreement provided that Medley's nominee (again, Robert Bryan) was to receive shares in the transaction, see, e g, Ex 19 at §§ 3, 5.  There were also draft

United States District Court

For the Northern District of California

agreements to embody the second stage of the transaction, Ex 18, and Medley testified that he received stock in the Workfire transaction, Test at 197-98 (discussing Workfire shares Medley held).  As in the previous transactions, Fordee ultimately held Medley's Workfire shares, see Ex 7 (Fordee account statements), and the stockholder agreement embodying the first stage of the Workfire transaction was made by Buffalo VII shareholders owning not less than approximately 75% of Buffalo VII's outstanding stock.  Ex 19 § 1.

          (4)  The final reverse merger was completed using the same two-stage structure.  Again with Medley's assistance, Digital Bridge merged into Black Stallion Management, Inc ("Black Stallion"), a public shell company.  See Test 48-49, 154-55.  The structure of the transaction was apparently the same as the M & A West transaction, with one agreement embodying the dilution and stock swap, Ex 22, and other agreements (again, not before the court as of this order) for the subsequent purchase of the Black Stallion shareholders' stock, see id § 17 (describing the stock purchase agreements as conditions subsequent).  Again, the Commission has supplemented the record to provide drafts of the stock purchase agreements embodying the second stage of the transaction.  LaMarca Decl (Doc #131) Ex 22C.  Fordee and Robert Bryan were to receive shares of the merged entity in the transaction, id, and indeed, shares of the merged entity were held in a Fordee brokerage account, see Ex 25 (Fordee account statements), or the account of Byzantine Investments, Inc ("Byzantine"), another entity controlled by Medley, see Ex 26 (Byzantine account statements).  Finally, as with the other

United States District Court

For the Northern District of California

1  transactions, the stockholder agreement embodying the first stage

2  of the Digital Bridge transaction was made by Black Stallion

3  shareholders owning not less than approximately 75% of Black

4  Stallion's outstanding stock.  Ex 12 preamble.

5          In the months following these transactions, Fordee and

6  Byzantine sold to the public in market transactions many of the

7  shares acquired in the four reverse mergers.  See Ex 7 (detailing

8  sales of Virtual Lender and M & A West stock); Ex 25 (detailing

9  sales of Black Stallion / Digital Bridge); Ex 26 (detailing sales

10 of Black Stallion / Digital Bridge).  From the materials before the

11 court, it does not appear that Medley sold any Workfire stock, and

12 Medley himself states in his testimony that he "never sold a share

13 of Workfire" and still "ha[s] all the shares of Workfire, mainly

14 because I thought it had a lot of potential and I didn't think it

15 was worth selling any shares."  Test at 197-98.  Medley was unaware

16 of any registration statement filed with respect to his

17 transactions in the securities of any of the four companies, Depo

18 at 61, and there is no evidence that any such registration

19 statements were in effect.

20

21                              III

22          The Commission moves for summary judgment on both its

23 claims: (1) violations of sections 5(a) and (c) of the of the

24 Securities Act, 15 USC §§ 77e(a) and (c), which concern

25 unregistered purchases and sales of securities, and (2) violations

26 of section 15(a) of the Exchange Act, 15 USC § 78o(a), which

27 prohibits the unregistered operations of brokers.  The court takes

28 them in turn.

United States District Court

For the Northern District of California

**A**

Section 5 of the Securities Act provides in relevant part:

    (a)    Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly --

        (1)    to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

        (2)    to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

                      * * *

    (c)    It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security * * *.

As noted above, there are exemptions to these rules.  Of relevance here is the exemption in section 4 that "[t]he provisions of section 5 shall not apply to -- (1) transactions by any person other than an issuer, underwriter, or dealer."

Medley asserts that his transactions were within the section 4(1) exemption (or Rule 144 promulgated under the Securities Act); the Commission contends that Medley was an "underwriter" as the term is defined section 2(11) of the Securities Act (a "statutory underwriter"), and therefore not entitled to the section 4(1) exemption.  The dispute thus turns on whether, in the transactions described above, Medley was a statutory underwriter as defined in section 2(11) and interpreted

10

in Rule 144 ("Persons Deemed Not to Be Engaged in a Distribution and Therefore Not Underwriters").

To be clear, the court does not understand the Commission to base its section 5 claim solely on the transfer of securities to Medley from the shareholders of the public shell companies. Standing alone, those transactions would arguably fall within the section 4(2) exemption for "transactions by an issuer not involving any public offering" or the so-called "4(1-1/2)" exemption, see, e g, <u>United States v Lindo</u>, 18 F3d 353, 358 (6th Cir 1994). Those transactions were apparently among sophisticated parties who had substantial access to information regarding the issuer's business condition, a situation with which the securities laws are not typically concerned. See <u>SEC v Ralston Purina Co</u>, 346 US 119, 125 (1953) (noting that "[a]n offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering'"). Rather, what the Commission challenges here is the complete distribution of securities to the public, for which a necessary ingredient was Medley's subsequent sale of the securities he acquired to the public at large through ordinary transactions in the market.

With the transactions in mind, the court turns to the definition of "underwriter" in section 2(11):

> The term ""underwriter" means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking * * *. As used in this paragraph the term "issuer" shall include, in addition to an issuer, any person directly or indirectly

United States District Court

For the Northern District of California

1          controlling or controlled by the issuer, or any
2          person under direct or indirect common control
           with the issuer.

3    This definition must be construed broadly so that the corresponding

4    exemption in section 4(1) will be construed narrowly.  See <u>SEC v</u>

5    <u>Blazon Corp</u>, 609 F2d 960, 968 (9th Cir 1979).

6          If Medley was a statutory underwriter, it was because he

7    purchased securities from an issuer with a view to the distribution

8    of those securities.  Given Medley's sales in the months after

9    receiving the securities, there is no doubt that Medley purchased

10   the securities with a view to distribution in the Virtual Lender, M

11   & A West and Digital Bridge transactions.  In the Workfire

12   transaction, there is at least a dispute of fact whether Medley

13   purchased with a view to distribution; he has apparently held the

14   securities for his own account since receiving them.  As such, the

15   Commission is not entitled to summary judgment on a violation of

16   Section 5 with respect to securities involved in the Workfire

17   transaction.

18         Accordingly, the key remaining question with respect to

19   the other three transactions -- and the focus of the parties'

20   dispute -- is whether Medley "purchased from an issuer."  Medley

21   contends, at least with respect to the two-step transactions

22   (involving M & A West and Digital Bridge), that the Buffalo IV and

23   Black Stallion stockholders were not "issuers" within the meaning

24   of section 2(11) because they were not control persons of the

25   issuers.  See, e g, Louis Loss & Joel Seligman, <u>Fundamentals of</u>

26   <u>Securities Regulation</u> 467-69 (Aspen, 5th ed 2004) [hereinafter

27   "Loss & Seligman"] (discussing control in the context of section

28   2(11)).  In particular, Medley points out, the Buffalo IV and Black

12

United States District Court

For the Northern District of California

Stallion stockholders were neither officers or directors of their companies (having resigned following the first stage of the transaction) nor did they control a significant amount of stock (their holdings having been diluted as part of the stock swap in the first stage of the transaction).

The Commission urges the court to look behind the formal two-step structure of the transactions to the underlying substance. In this connection, the Commission relies heavily on <u>SEC v Cavanaugh</u>, 1 F Supp 2d 337, 363-66 (S D NY) (Cote, J), <u>aff'd</u> 155 F3d 129 (2d Cir 1998), which advanced (arguably in dictum) the concept that two-step transactions such as those here should be regarded as an integrated whole for purposes of applying a section 4 exemption.

The court agrees with Judge Cote's thoughtful analysis, but also finds it unnecessary to apply the rubric of integration to the transactions here to reach the result the Commission urges. Neither the Commission nor Medley is attentive to the question of what constitutes a "purchase" under section 2(11).  To the extent Medley and his compatriots believed they were complying with the law, they acted as if "purchase" occurs only upon transfer of title -- on the second day, in the second stage of the merger transaction, at a moment when the shell company stockholders were not control persons of the shell companies.  The Commission does not directly dispute this interpretation of "purchase," although the integration analysis the Commission offers is effectively an argument about what components of a multi-stage transaction are part of the same "purchase" transaction.

Rather than rely on the superstructure of an integration

analysis, it is far more direct to interpret "purchase." "Purchase" is not defined in section 2 (or elsewhere), but its obverse, "sell" is defined in section 2(3):  "The term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value."  By extension, a "purchase" includes every contract for purchase, irrespective of when title may be transferred.  Indeed, in this context, there seems to be no relevant distinction between a purchase and a sale; the lone use in section 2(11) of the undefined term "purchased" rather than the defined term "sale" seems to be the product of syntactical convenience alone.

The broad interpretation of "purchase" has ready application to this case:  Irrespective of when Medley obtained title to the securities, there is no question that the <u>contracts for purchase</u> were formed at a time when the Buffalo IV and Black Stallion shareholder groups were undoubtedly control persons by virtue of their substantial holdings (at least about 75%) and their ability to direct the corporate reorganization.  See also Loss & Seligman at 467 ("[C]ontrol may rest with a <u>group</u> of persons * * *." (citing <u>Arthur Children's Trust v Keim</u>, 994 F2d 1390, 1397 (9th Cir 1993) (emphasis in original)).  Indeed, even the documents embodying the first stages of the transactions contemplate the delivery of securities to Medley's nominee.  See, e g, Ex 10 § 6 (M & A West transaction); Ex 22 § 17 (Digital Bridge transaction, specifying performance of the second stage contract as a condition subsequent to the first stage contract).  The same analysis applies to the Virtual Lender transaction; that transaction consists of a single contract, making the analysis simpler still.

14

**United States District Court**

For the Northern District of California

It is of no moment that the parties may not have executed the written contracts (in particular, the stage two stock purchase contracts) until after the public shell company's shareholders were no longer control persons.  A contract may be formed without reduction to writing.  In these transactions, the two instruments were negotiated in tandem.  See, e g, Ex 11 (transmission of both draft agreements under one cover).  Moreover, business sense dictates that the two transactions could not be freestanding:  The first stage, standing alone, was overwhelmingly favorable to the public shell company stockholders (who exchanged some near-worthless shares for the shell company taking over an operating company).  The second stage, standing alone, was overwhelmingly favorable to the private company stockholders (who were allowed to purchase the public shell company stockholders' now-valuable shares for a pittance).  The two stages were complementary and necessarily were entered into as part of a single implied or oral contract.

Medley's response to the Commission's arguments (which, again, frames the issue largely as one of integration) is that he acted in reliance on Rule 144.  Rule 144, 17 CFR § 230.144, is a "safe harbor" rule that specifies concrete conditions under which a person will not be engaged in a distribution and therefore deemed not to be a statutory underwriter.  Rule 144 is somewhat intricate, and the court need not discuss it in detail -- although a summary of its operation may be found in Loss & Seligman at 430-34.  The issue here turns on whether the securities Medley received in the reverse mergers were "restricted securities" within the meaning of Rule 144(a)(3):  If the securities were not restricted, Medley's subsequent sales were exempt from registration, pursuant to Rule

United States District Court

For the Northern District of California

144(k).  If the securities were restricted, Medley was required to hold the securities for one year under Rule 144(d)(1) -- something he did not do (except, again, for his Workfire Shares).

Rule 144(a)(3) designates several categories of securities as "restricted securities," but only one category, Rule 144(a)(3)(i), applies here:  "Securities that are acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering."  "Affiliate" is in turn defined by Rule 144(a)(1) in the same way that the second sentence of section 2(11) expands the definition of "issuer"; in short, affiliates are control persons, which the Buffalo IV and Black Stallion stockholders were at the time the transaction documents were executed.  (And, again, for the one-stage Virtual Lender transaction, it is undisputed that Medley took his securities from an affiliate, making his securities restricted under Rule 144(a)(3)(i).)

Accordingly, the question once again turns on the meaning of a past participle -- section (2)(11) uses "purchased from an issuer"; Rule 144(a)(3)(i) substitutes "acquired * * * from an affiliate of the issuer."  The court has already construed "purchased" to include contracts to purchase, and there is no indication that the Commission intended "acquired" to be less expansive than "purchased"; if anything, "acquired" encompasses more than the simple cash-for-stock transactions suggested by "purchased."  Furthermore, the court doubts that the Commission has the authority to give a safe harbor in Rule 144 to conduct that Congress itself has forbidden through sections 2(11), 4(1) and 5.

Finally, Medley makes a variety of arguments about

16

United States District Court

For the Northern District of California

positions the Commission has taken in the past, about whether his conduct was clearly a violation at the time of the transactions, about his reliance on counsel and so forth.  These may all be relevant to the remedies the Commission seeks -- injunctive relief and civil monetary penalties must be based on a concern that the defendant will continue to violate the securities laws and therefore must be restrained or deterred from doing so.  See Loss & Seligman at 1057-60 (discussing civil monetary penalties); id at 1411-17 (discussing injunctions).  But these arguments are irrelevant to Medley's liability for the offenses, because scienter is not an element of the violation of the registration provisions of the Securities Act.  <u>Aaron v SEC</u>, 446 US 680, 714 n5 (1980) (Blackmun, J, concurring in part and dissenting in part) ("The prohibition in § 5 of the 1933 Act, 15 USC § 77e, against selling securities without an effective registration statement has been interpreted to require no showing of scienter." (citing cases)).

Accordingly, the court concludes that Medley has violated sections 5(a) and (c) of the Securities Act, 15 USC §§ 77e(a) and (c).  The Commission's motion for summary judgment against Medley on claim 1 of the complaint is therefore GRANTED, although only with respect to Medley's transactions in the securities of Virtual Lender, M & A West and Digital Bridge.


B

The SEC's second claim against Medley is that by bringing together the public shell companies and the private operating companies, Medley acted as an unregistered broker in violation of section 15(b) of the Exchange Act.  Section 15(b) provides in

17

United States District Court

For the Northern District of California

relevant part:

> It shall be unlawful for any broker * * * to
> make use of the mails or any means or
> instrumentality of interstate commerce to
> effect any transactions in, or to induce or
> attempt to induce the purchase or sale of, any
> security * * * unless such broker * * * is
> registered in accordance with subsection (b) of
> this section.

It is undisputed that Medley was not registered as a broker.
Likewise, his conduct may fairly be described as inducing the
purchase or sale of securities.  The only question is whether he
was in fact a broker.  Section 3(a)(4)(A) of the Exchange Act
defines a "broker" as "any person engaged in the business of
effecting transactions in securities for the account of others."

The Commission's entire opening argument on this issue
(aside from a boilerplate introduction) is a one-paragraph string
of factual assertions and legal conclusions, unconnected by any
interpretive or precedential authority:

> Medley actively brokered the sale of stock
> between the shell owners and the M & A West
> affiliates and their shareholders in each of
> the four reverse mergers.  Medley thus acted as
> the middle-man in the transactions, inserting
> himself as the person through whom the parties
> on the two sides of the transaction would
> exchange their respective shares.  In fact,
> Medley ensured that the transactions could not
> be completed without him, by requiring the
> shell company's shareholders to enter into
> "Non-circumvention Agreements."  Medley further
> facilitated the purchase and sale of the
> securities exchanged in the reverse mergers by
> drafting the agreements, obtaining concurrence
> on the terms, and obtaining the necessary
> signatures and other information.  And, Medley
> was paid handsomely for his services, receiving
> between $50,000 and $75,000 in cash upon
> completion of each transaction, and blocks of
> stock in the four companies.  Medley was thus
> acting as an unregistered broker with respect
> to each of the four mergers, in violation of

United States District Court

For the Northern District of California

1    the Exchange Act.

2

3    Mot Summ Judg (Doc #109) at 21:19-22:2.

4         This factual recitation capped with an ipse dixit sheds

5    no light on why Medley's activities -- commonly associated with

6    paralegals (who draft documents), lawyers (who draft documents and

7    orchestrate transactions), businessmen (who identify potential

8    merger partners) and opportunists (who like to take a small cut of

9    a big transaction), none of whom is commonly regarded as a broker -

10   - add up to Medley being a broker.  In particular, no assets were

11   entrusted to Medley, and the Commission identifies no evidence that

12   he was authorized to transact "for the account of others" (aside

13   from his fiduciary authority over Fordee's and Byzantine's

14   accounts).  Although Medley was in the business of <u>facilitating</u>

15   securities transactions <u>among other persons</u>, the Commission cites

16   no authority for the proposition that this equates to "<u>effecting</u>

17   transactions in securities <u>for the account of others</u>."  When asked

18   at oral argument for some authority -- in the form of a case or a

19   no-action letter -- that held conduct like Medley's to be that of a

20   "broker," the Commission responded simply that it relied on the

21   statute.  A bare statutory definition without interpretive

22   authority (or even reasoned argument from the statutory language)

23   is too slender a reed on which to condemn Medley's conduct.

24   Accordingly, the Commission's motion for summary judgment on this

25   claim is DENIED.  If authority in this area is as lacking as

26   counsel maintains, the Commission may wish to consider promulgating

27   rules beyond Rules 3a4-1 to -6 to give further guidance.

28        Further, with the well-developed record before the court,

                                    19

the absence of any issues of fact and the parties' complete (if modest) briefing on this issue, the court finds it appropriate to GRANT sua sponte summary judgment in favor of Medley on the Commission's claim against him for violation of section 15(a) of the Exchange Act.  See, e g, <u>Gospel Missions of America v City of Los Angeles</u>, 328 F3d 548, 553 (9th Cir 2003) ("Even when there has been no cross-motion for summary judgment, a district court may enter summary judgment sua sponte against a moving party if the losing party has had a 'full and fair opportunity to ventilate the issues involved in the matter.'" (citing <u>Cool Fuel, Inc v Connett</u>, 685 F2d 309, 312 (9th Cir 1982)).

                                IV

     In sum, the Commission's motion for leave to supplement the record (Doc #130) is GRANTED.  The court GRANTS IN PART the Commission's motion for summary judgment (Doc #109) and sua sponte GRANTS summary judgment in favor of Medley on the Commission's claim for violation of section 15(a) of the Exchange Act.

     As the court has indicated above, the matter of remedies remains subject to debate.  The court would benefit substantially from briefing focused on the issue of remedies.  Accordingly, the Commission shall file a memorandum on appropriate remedies on or before July 7, 2005, stating with particularity the remedies it seeks.  Medley shall file a response on or before July 21, 2005.

/

/

/

/

United States District Court

For the Northern District of California

1 /

2 /

3 The court will hear oral argument on remedies on August 4, 2005, at

4 2:00 pm.

5

6          IT IS SO ORDERED.

7

8

9          VAUGHN R WALKER

10          United States District Chief Judge