IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

```
SECURITIES & EXCHANGE COMMISSION,        No   C-01-3376 VRW

          Plaintiff,                          ORDER

          v

M & A WEST, INC et al,

          Defendants.
                                        /
```

        This court granted summary judgment for plaintiff Securities & Exchange Commission ("SEC") against defendant Stanley Medley ("Medley") on the SEC's claim that Medley offered and sold securities without filing a required registration statement, violating sections 5(a) and (c) of the Securities Act of 1933 (the "Securities Act"), 15 USC §§ 77e(a) and (c).  SJ Ord (Doc #136). Medley procured these securities as payment for facilitating three reverse merger transactions.  Id at 6-9.  The summary judgment order discusses the main facts of this case so there is no need to recite them here, though further relevant facts will be discussed as needed below.

1    The court reserved the matter of remedies for future
2 consideration and asked both parties to brief the issue.  Id at
3 20:19-21:4.  The SEC submitted a memorandum requesting three
4 separate remedies: disgorgement with interest, civil penalties and
5 a permanent injunction.  SEC Br (Doc #141).  Medley objected to all
6 of these remedies and moved to strike most of the supporting
7 exhibits that plaintiff had attached to its memorandum.  Medley Br
8 (Doc #145-1).  The court considers these issues in turn.

I

11    The SEC seeks to disgorge with interest the salary that
12 Medley received for the reverse merger transactions.  SEC Br at 5-
13 7, 10-12.  It also seeks with interest profits from the
14 unregistered sales of securities that Medley received in the
15 reverse mergers.  Id.
16    "The district court has broad equity powers to order the
17 disgorgement of 'ill-gotten gains' obtained through the violation
18 of securities laws."  SEC v First Pacific Bancorp, 142 F3d 1186,
19 1191 (9th Cir 1998).  And whether to award prejudgment interest is
20 a question of fairness lying within the court's sound discretion
21 and depending on the balancing of equities.  Knapp v Ernst &
22 Whinney, 90 F3d 1431, 1441 (9th Cir 1996); SEC v Henke, 275 F Supp
23 2d 1075, 1082 (ND Cal 2003).  The court should "consider a number
24 of factors, including whether prejudgment interest is necessary to
25 compensate the plaintiff fully for his injuries, the degree of
26 personal wrongdoing on the part of the defendant, the availability
27 of alternative investment opportunities to the plaintiff, whether
28 the plaintiff delayed in bringing or prosecuting the action, and

2

other fundamental conditions of fairness." <u>Osterneck v Ernst & Whinney</u>, 489 US 169, 176 (1989).

In this case, summary judgment was granted against Medley for selling unregistered stock, which he had received as payment for facilitating three separate reverse mergers involving VirtualLender.com, Inc ("Virtual Lender"), M&A West, Inc ("M&A West") and Digital Bridge, Inc ("Digital Bridge"). SJ Ord at 6-9. Medley pocketed approximately $1.8 million from his illegal stock sales and he received a salary of $175,000 for facilitating the three reverse mergers. SEC Br at 5-7.

Even though Medley may be honest in his claims that he will not violate the securities laws in the future, such assurances do not cure past misdeeds. Simply put, Medley should not be allowed to benefit from his unlawful conduct, even if he acted in good faith. And disgorging Medley's profits might deter other would-be violators from engaging in similar behavior. Hence, disgorgement with interest is an appropriate remedy here.

Concerning the amount to disgorge, the SEC seeks to recover the money received from the Virtual Lender, M&A West and Digital Bridge mergers, as well as from a fourth reverse merger involving Workfire.com ("Workfire"). SEC Br at 10-12. Summary judgment was not granted against Medley for the Workfire merger because Medley did not sell any stock that he received from the transaction, though he did receive a salary of $75,000. SJ Ord at 17:19-22; SEC Br at 6:2-3. The SEC argues that the disgorgement remedy should include Medley's Workfire salary because he facilitated the merger to help other co-defendants violate the securities laws.

The court disagrees with the SEC's argument. In effect, the SEC's proposed remedy would relitigate the issue of Medley's liability for the Workfire merger, on which summary judgment was not granted. If the SEC wants to disgorge the $75,000 that Medley received for that transaction, then it must first obtain a judgment against him on that matter. The SEC cannot piggyback liability for the Workfire transaction on the other mergers.

Accordingly, Medley must disgorge with interest the salary and profits from stock sales for the three reverse merger transactions for which he was held liable. Because Medley never objected to any aspect of the SEC's disgorgement calculation other than the inclusion of the Workfire merger, the court adopts the SEC's proposed annual compounding method, which is reasonable. Disgorgement plus pre-judgment interest (D) is calculated using the formula: $D = P(1 + r/m)^{(t*m)}$, where P = disgorgement principal value, r = pre-judgment interest rate, m = number of times per year interest is compounded and t = number of years. Cf Richard A Brealey & Stewart C Myers, <u>Principles of Corporate Finance</u> 36-39 (McGraw-Hill, 1991). Under the annual compounding method adopted by the SEC, m = 1, so the formula simplifies: $D = P(1+r)^t$.

The court accepts the SEC's proposed values of P = $1,990,750.44 and t = 4 5/6 years, which approximates the time between Medley's last unregistered sale on October 3, 2000, and the hearing on August 11, 2005. SEC Rev Calc (Doc #153), Ex 27A. The court also adopts the SEC's proposed pre-judgment interest rate of 6.08%, which is r = .0608. Id. Even though 28 USC § 1961 on its terms applies only to post-judgment interest, the Ninth Circuit has suggested that courts should also use that provision to calculate

**4**

pre-judgment interest rates unless there is substantial evidence that the case's equities require a different rate. <u>Western Pacific Fisheries, Inc v SS President Grant</u>, 730 F2d 1280, 1289 (9th Cir 1984). Under 28 USC § 1961(a), the interest rate to apply is "the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding * * * the date of the judgment." Adapting this language to the pre-judgment context here, the court agrees with the SEC that the relevant date is October 3, 2000, the date of Medley's last sale. SEC Rev Calc, Ex 27A. The court also believes the SEC in its claim that the § 1961(a) rate on that date was 6.08%, and hence, the court adopts $r = .0608$ for calculating pre-judgment interest.

Plugging in these values into the annual compounding formula, the court calculates that Medley owes \$2,647,964.29 in disgorgement plus interest.

II

The court next determines whether it can award civil penalties and/or injunctive relief on summary judgment. Unlike at the liability stage, in which scienter was irrelevant, scienter matters when determining the amount and type of these remedies. And the issue of scienter is disputed between the parties here. SEC Br at 14:16-19, 17:13-14; Medley Br at 8:25-26, 12:25-26. Nonetheless, the court can set a civil penalty and injunction on summary judgment because specifying these remedies does not implicate the Seventh Amendment jury trial right. "[T]he right to a jury trial does not attach to purely injunctive actions brought

5

1  by the [Securities and Exchange] Commission." SEC v Rind, 991 F2d
2  1486, 1493 (9th Cir 1993).  Also, "a determination of a civil
3  penalty is not an essential function of a jury trial, and * * * the
4  Seventh Amendment does not require a jury trial for that purpose in
5  a civil action."  Tull v United States, 481 US 412, 427 (1987).
6  Hence, the court can decide the scope of both of these remedies
7  based on the briefs and the oral hearing held on August 11, 2005.
8          In determining the civil penalty amount, the court must
9  consider the facts and circumstances of the case.  15 USC §
10 77t(d)(2)(A).  The SEC alleges that Medley committed three "second-
11 tier" Securities Act violations that should be punished at $55,000
12 each, summing to $165,000.  SEC Br at 14:14-15; 15 USC §
13 77t(d)(2)(B); 17 CFR § 201.1001 & tbl 1.  A second-tier penalty is
14 an intermediate level sanction that can be imposed only if the
15 violation "involved fraud, deceit, manipulation, or deliberate or
16 reckless disregard of a regulatory requirement."  15 USC §
17 77t(d)(2)(B).  The SEC asserts that Medley deliberately or
18 recklessly failed to register his sales of stock that he received
19 for facilitating the three reverse merger transactions on which
20 summary judgment was granted.  SEC Br at 13-14.
21         In rebuttal, Medley only argues that he did not knowingly
22 violate the registration provisions.  He asserts that at most, he
23 should receive a "first-tier" penalty, which permits fines of
24 $5,500 per violation, even if committed in good faith.  Medley Br
25 at 12:16-26; 15 USC § 77t(d)(2)(A); 17 CFR § 201.1001 & tbl 1.
26         The court agrees with the SEC that Medley deserves
27 second-tier penalties.  The SEC asserts that Medley deliberately
28 tried to hide his involvement in the illegal securities

transactions by using another individual, Robert Bryan, as a nominee for Medley's shares, and then transferring the shares into two companies that Medley controlled, Fordee Management Company ("Fordee Management") and Byzantine Investments, Inc ("Byzantine"). SEC Br at 7-9. Medley contends that this arrangement was for estate planning — he claims that Bryan is a friend who is a godfather of Medley's children and was to be the trustee of Fordee Management if Medley died. Ro Decl (Doc #110), Ex 2 at 24:21-25:1. Medley also claims he can show his good faith through attorney opinion letters apparently approving his stock sales. Medley Br at 6:6-12.

Medley's arguments fail to persuade. Medley has not shown how involving these companies or Bryan in the reverse mergers furthered his estate planning. In fact, Medley's deposition testimony suggests otherwise. Medley admitted that he deposited his merger consulting fees with these companies in a "fairly arbitrary" fashion, which suggests that he did not have a carefully thought-out estate planning scheme. Ro Decl, Ex 1 at 37:16-38:3. When asked why Bryan was named a party to a merger, Medley answered:

> You know, I don't know. It was sort of like — we had never done a transaction with these people before. And it was just sort of a way of protecting our transfers by including his name in the document. It was a way of him having noncircumvention agreements. It was a way of not potentially screwing us and excluding us from the transaction. And that was the only reason it was put in. No one objected to it, and left it in, so it protected our interest.

Id, Ex 2 at 188:12-20. This response, which makes little sense, differs from Medley's purported estate planning rationale. And

7

Medley's claim that Bryan is a friend with important responsibilities over Medley's children is dubious considering that Medley admitted he had not visited Bryan in years and did not know where Bryan lived. Id, Ex 1 at 33:12-19; id, Ex 2 at 25-27. Although Medley claimed that "Robert [Bryan] works for me, and I asked [Bryan] to find some people that had shells," he never could explain why Bryan was Medley's nominee in the mergers. Id, Ex 2 at 45:8-17.

Medley's alleged reliance on attorney opinion letters does not help him either. Medley has provided three opinion letters apparently approving stock sales stemming from the Workfire, Black Stallion and M&A West reverse mergers. Medley SJ Decl (Doc #121), Ex 1. Medley did not sell shares that he received from the Workfire transaction, so the opinion letter for that transaction is irrelevant. SJ Ord at 12:11-17.

Also, Medley cannot rely on the attorney opinion letter approving the stock sales relating to the Black Stallion transaction because the attorney, Thomas H Cadden ("Cadden"), assumed incorrect facts. Cadden's opinion letter on February 4, 2000, approves the reissuance of stock that shareholders — which included Robert Bryan and Fordee Management — received in the Black Stallion reverse merger. Medley SJ Decl, Ex 1 at 3-4. But Cadden's opinion is based on an explicit assumption that "the shareholders * * * had no prior relationship with the Company by share ownership or otherwise." Id at 2. This assumption was incorrect because both Bryan and Fordee Management had significant prior relationships with the company — both parties received their shares through the merger, and Fordee Management was controlled by

8

United States District Court
For the Northern District of California

1 Medley, who facilitated the merger. SJ Ord at 8-9. Medley claims
2 he informed Cadden about his relationship with Bryan and Fordee
3 Management, but he does not provide any evidence to support this
4 naked assertion. Medley Decl (Doc #146) at ¶ 7. "To qualify for
5 an advice of counsel [jury] instruction, the defendant must show
6 that there was full disclosure to his attorney of all material
7 facts, and that he relied in good faith on the specific course of
8 conduct recommended by the attorney." United States v
9 Ibarra-Alcarez, 830 F2d 968, 973 (9th Cir 1987). Hence, the Cadden
10 attorney opinion letter does not shield Medley from civil
11 penalties.
12     Moreover, Medley cannot rely on the opinion letter
13 approving the stock sales for the M&A West transaction because the
14 opinion is tainted by a conflict of interest. Gary S Joiner
15 ("Joiner") is the attorney who provided a May 13, 1999, opinion
16 letter indicating that Fordee Management, a purchasing shareholder,
17 could reissue its shares without restriction. Medley SJ Decl, Ex 1
18 at 7-9. The opinion letter also indicates that Joiner is the
19 leading selling shareholder in the transaction. Id at 7. Joiner's
20 large stake in the transaction may have created an incentive for
21 him to find the stock sales to be legal when in fact they were not.
22 Hence, Joiner may have been tainted in his ability to provide an
23 objective opinion letter. Because this conflict of interest was
24 apparent on the very face of the opinion letter, Medley cannot
25 claim that he relied in good faith on the letter in selling the
26 unregistered stock.
27     The only reasonable explanation why Medley used Bryan and
28 the shell companies was to shield Medley's involvement in the

9

illegal securities transactions. Although Bryan was a nominee for the three reverse mergers, the shares were ultimately transferred to Fordee Management and Byzantine — entities that Medley controlled. SJ Ord at 6-9. Medley then illegally sold this stock for nearly $2 million. Bryan, however, received only "a small amount of money" and was "not really getting commission" for his involvement in the scheme. Ro Decl, Ex 2 at 158:2-14. This arrangement suggests that Bryan was involved in the transaction only in name to shield Medley, who was the true beneficiary.

Moreover, the court believes that second-tier civil penalties are necessary here to deter future fraudulent conduct. Even if Medley's business does not focus primarily on reverse mergers, as he claims, a civil penalty will make Medley think twice before pursuing any questionable business practice. And even if Medley is honest when he claims that he will obey the law in the future, civil penalties can still deter others from similarly breaking the law.

Finally, the court notes that the SEC has shown restraint in the penalty it seeks. Under 15 USC § 77t(d)(2), the SEC may impose a civil penalty up to the amount disgorged, even for a first-tier violation. This penalty would have been about $2 million, which would far exceed the $165,000 requested by the SEC. Alternatively, the SEC could have treated each of Medley's hundreds of illegal stock sales as a separate offense. La Marca Decl (Doc #142), Exs 28-30. Even if punished as a first-tier offense at $5,500 per violation, the total penalty would far exceed the amount the SEC has requested. Moreover, in determining the penalty amount, the SEC was conscious to avoid exceeding the $550,000 of

10

1 penalties imposed on co-defendant Frank Thomas Eck, III, who
2 engaged in much more egregious conduct including filing false
3 reports with the SEC, making false representations to auditors and
4 defrauding investors.  Eck SJ Ord (Doc #102-1) at 2:20-28, 4:6-7.
5 Given these considerations, the court agrees with the SEC that a
6 total civil penalty of $165,000 is appropriate, based on three
7 second-tier civil penalties of $55,000 each.

### III

The SEC also requests a permanent injunction against defendant's future violations of sections 5(a) and 5(c) of the Securities Act.  SEC Br at 16-20.  Although a request to enjoin someone from breaking a law seems odd, the SEC provides two reasons for seeking this injunction.  First, the SEC claims the injunction will send a continuing message to Medley that his future conduct must be lawful.  By hanging the sword of injunctive relief over Medley's head, the argument goes, he is more likely to obey the law.  Second, the SEC claims the injunction has certain practical benefits.  The SEC asserts that, for example, if Medley ever works as an officer for a public company, he would have to disclose the injunction against him.  Hence, the injunction not only serves as a scarlet letter, but it also warns others about Medley's unlawful past.  The court notes that a "scarlet letter" punishment has been upheld in another, albeit rather different, context.  See <u>United States v Gementera</u>, 379 F3d 596 (9th Cir 2004).  Furthermore, of course, a violation of the injunction may be punished civilly with its less stringent burden of proof.

//

1    The SEC must show that an injunction is appropriate
2 because there is a reasonable likelihood that Medley will violate
3 these laws in the future. SEC v Fehn, 97 F 3d 1276, 1295 (9th Cir
4 1996). The court should consider the totality of the
5 circumstances, including five factors: "(1) the degree of scienter
6 involved; (2) the isolated or recurrent nature of the infraction;
7 (3) the defendant's recognition of the wrongful nature of his
8 conduct; (4) the likelihood, because of defendant's professional
9 occupation, that future violations might occur; (5) and the
10 sincerity of his assurances against future violations." Id at
11 1295-96.
12    The first factor strongly favors the SEC, because the
13 court has already determined that scienter was present by awarding
14 second-tier civil penalties against Medley. The second factor also
15 favors the agency — although there are only three reverse merger
16 transactions at issue, Medley repeatedly violated the law by
17 selling the unregistered securities hundreds of times. La Marca
18 Decl, Exs 28-30.
19    With respect to the third and fifth factor, Medley seems
20 to recognize the wrongful nature of his conduct, and he asserts
21 that his previous actions were unintentional and that he will act
22 lawfully in the future. Medley Br at 9:11-18, 10:5-8.
23 Accordingly, these factors appear to weigh in Medley's favor.
24    The parties disagree over the fourth factor, which
25 relates to the scope of Medley's professional occupation. The SEC
26 contends that Medley is likely to repeat these offenses because he
27 deliberately and evasively violated the law in the past, and
28 because he still advises persons in offering securities to the

12

1 public. SEC Br at 9:3-10:6, 16:21-17:12. Medley counters that
2 reverse merger transactions are only a small part of his business.
3 Medley Decl at ¶¶ 8-9.

4 The court believes that this factor favors the SEC.
5 Although Medley may not focus on reverse mergers, he does not
6 dispute that these transactions form a part of his business. And
7 by facilitating the reverse mergers in this case, Medley netted
8 about $2 million — hardly an insignificant sum. Hence, it is very
9 likely that Medley's professional occupation would encourage future
10 violations.

11 Taken together, these factors support granting an
12 injunction. But because two of the factors weigh in Medley's
13 favor, an injunction of indefinite length is too stringent. "The
14 district court has broad powers and wide discretion to frame the
15 scope of appropriate equitable relief." <u>SEC v United Financial</u>
16 <u>Group, Inc</u>, 474 F2d 354, 358-59 (9th Cir 1973). Accordingly, the
17 court grants a five-year injunction effective today against
18 Medley's future violations of sections 5(a) and 5(c) of the
19 Securities Act. The court believes the five-year duration prevents
20 Medley from violating the law in the future while not subjecting
21 him to the perpetual threat of an injunction.

22

23 IV

24 Medley objected to exhibits 32-40 that the SEC attached
25 to its remedies memorandum. Medley Br at 3:6-4:20. Medley moved
26 to strike exhibits 32-37 on the grounds that they had not been
27 properly authenticated, and exhibits 38-40 on the grounds that they
28 are inadmissible hearsay. Id. Because the court does not rely on

any of these exhibits in this decision, Medley's objections are moot.

V

In sum, the court holds that Medley owes $2,647,964.29 in disgorgement and $165,000 in civil penalties. Moreover, the court grants a five-year injunction effective today against Medley's future violations of sections 5(a) and 5(c) of the Securities Act.

IT IS SO ORDERED.

VAUGHN R WALKER

United States District Chief Judge